## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 16 2019, 6:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew W. Lutz
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of:<br><br>C.L. and N.L. (Minor Children)<br><br>and<br><br>T.N. (Mother),<br><br>*Appellant-Respondent,*<br><br>        v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Plaintiff* | January 16, 2019<br><br>Court of Appeals Case No.<br>18A-JT-1790<br><br>Appeal from the Vanderburgh Superior Court<br><br>The Honorable Brett J. Niemeier, judge<br><br>Trial Court Cause Nos.<br>82D04-1802-JT-262, 82D04-1802-JT-263 |

**Altice, Judge.**

## Case Summary

T.N. (Mother) appeals the termination of her parental rights to her two minor children. She contends that the trial court's termination order is not supported by sufficient evidence.

We affirm.

## Facts & Procedural History

Mother and K.L. (Father) have two children together – C.L. born in September 2007 and N.L. born in November 2012.[1] C.L. and N.L. (the Children) are involved in these proceedings. Mother also has given birth to five other children. Two are now adults, and three were adopted in 2007 after Mother voluntarily terminated her parental rights to them. Mother has a long history of involvement with the Indiana Department of Child Services (DCS), beginning around the year 2000. This history includes eight prior substantiations and three CHINS cases over the years. The prior cases involved drugs, neglect, and/or physical abuse.

On February 13, 2017, DCS received a report alleging that Mother was exhibiting erratic behaviors indicative of drug use. Further, C.L. had been

---

[1] Father's parental rights were also terminated, but he does not participate in this appeal.

absent from school since February 7. When school officials went to the home for a welfare check, they became concerned regarding Mother's behavior.

[5] William Wargel, with DCS, visited the home on February 14, 2017, to assess the situation. Mother complained to Wargel that there were spider mites in her home crawling all over her, but Wargel observed no bugs. A pest control company later confirmed there were no such bugs in the home. Wargel observed red marks on Mother's skin that appeared like "pick marks" indicative of methamphetamine use. *Transcript* at 52. He observed that Mother was "acting erratically, fidgety, and could not keep a straight thought." *Id*. Mother refused a drug screen. After this visit, Mother avoided DCS for about six days and still did not send C.L. back to school.

[6] In the meantime, on February 16, 2017, DCS filed petitions alleging C.L. and N.L. to be CHINS. Wargel located Mother and the Children on February 20, and the Children were removed from the home that day and placed in foster care. The Children were adjudicated CHINS on March 8, 2017, with Mother entering a stipulation.

[7] Following the dispositional hearing on April 19, 2017, the trial court ordered Mother to participate in a number of services. Of particular note, Mother was ordered to obtain substance abuse and mental health evaluations and follow any treatment recommendations, submit to random drug screens, attend supervised visitation, keep all appointments, and remain drug and alcohol free. Mother quickly fell out of compliance and by August was found in contempt.

[8] A court-ordered facilitation meeting was held on February 1, 2018. At the time, Mother did not have a stable home or finances, had not visited with the Children for over a month, and had not completed mental health and substance abuse evaluations or treatment. Although Mother tested clean at the meeting, she had not submitted to drug testing for months leading up to the meeting. While Mother had made little to no effort at reunification, the Children were thriving in foster care. Ultimately, the court facilitator recommended that DCS seek termination of Mother's parental rights.

[9] On February 8, 2018, DCS filed petitions to terminate Mother's parental rights with respect to the Children. The trial court held a factfinding hearing on June 15, 2018. At that hearing, DCS presented evidence regarding Mother's nearly complete lack of effort in this case, as summarized below.

[10] Although initially compliant with supervised visits, Mother cancelled all visits in June and July 2017. After her Christmas Eve visit, Mother did not see the Children again until March 7, 2018. Thereafter, visits were suspended by the court due to the negative impact that the inconsistent visits were having on the Children. At the time of the final hearing, therefore, Mother had only seen the Children once in nearly six months.

[11] Between March 2017 and the end of May 2018, Mother was required to submit to 138 drug screens. She had 65 no shows, 59 positive screens, and only 14 clean screens. Mother tested positive for methamphetamine on May 21, 2018, less than a month before the termination hearing.

[12]     Early in the CHINS case, Mother was ordered to complete substance abuse and mental health evaluations and treatment. More than a year after the Children had been removed from her home, Mother completed an initial evaluation at Stepping Stones on February 23, 2018, but she failed to attend three consecutive follow-up therapy sessions in March and was discharged from the program. Four days prior to the termination hearing, Mother went to Counseling for Change for an intake appointment. At the time of the hearing, Mother had yet to complete any recommended treatment.

[13]     Throughout the CHINS proceedings, Mother failed to maintain stable housing or income. At the time of the termination hearing, Mother testified that she had been employed at McDonalds for just one month. She was living in a one-bedroom apartment with her fiancé, W.F., who had just been released from incarceration. W.F. has been convicted of drug dealing in Texas and domestic battery (not of Mother) in Indiana. Prior to his most-recent incarceration, law enforcement had responded to a number of domestic calls in 2016 involving Mother and W.F., eventually resulting in a protective order against W.F. Family case manager (FCM) Nathan Austin, as well as the CASA, expressed concern regarding Mother's relationship with W.F.

[14]     Finally, DCS presented evidence that the Children were thriving in foster placement. C.L. had struggled academically and behaviorally at school while in Mother's care. The CASA testified that C.L. had made significant progress in foster care, going from a D/F student to a B student with "absolutely no behavior issues." *Id.* at 57. Both the CASA and FCM Austin opined that

termination of Mother's parental rights was in the best interests of the Children. Further, although the Children were not in a pre-adoptive foster home, FCM Austin testified that the plan for the Children was adoption through the SNAP program. He indicated that they would be adopted into the same home and that he foresaw "[n]o obstacle whatsoever" to them being adopted. *Id.* at 78.

[15] On July 11, 2018, the trial court issued orders terminating Mother's parental rights with respect to C.L. and N.L. Mother now appeals. Additional facts will be provided below as needed.

## Discussion & Decision

[16] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[17] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States

Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[18] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a

satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[19] On appeal, Mother asserts that there is insufficient clear and convincing evidence that the conditions resulting in the Children's removal would not be remedied, that the continuation of the parent-child relationship poses a threat to the well-being of the Children, that termination is in the best interests of the Children, and that there is a satisfactory plan for the care and treatment of the Children following termination. In so arguing, Mother does not challenge any of the trial court's specific findings as not supported by the evidence or claim that the judgment is not supported by the findings. She simply directs us to her own testimony that she had a job, an apartment, and sufficient income to provide for the Children, as well as that she had six clean screens in 2018 and had scheduled her first appointment at Counseling for Change.

[20] We reject Mother's blatant invitation to reweigh the evidence. DSC presented ample evidence to establish by clear and convincing evidence that there is a reasonable probability that the conditions resulting in the Children's removal or continued placement outside the home will not be remedied.[2] In making this determination, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration

---

[2] The trial court determined that DCS had proven both subsections (b)(2)(B)(i) and (b)(2)(B)(ii). Because DCS was required to establish only one of these by clear and convincing evidence, we focus our review on subsection (b)(2)(B)(i).

evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id*. In conducting this inquiry, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. Further, it is within the trial court's discretion to disregard efforts made only shortly before termination and to weigh more heavily a parent's history of conduct prior to those efforts. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1234 (Ind. 2013). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210.

[21] Here, the evidence establishes that prior to commencement of the termination proceedings – a year into the CHINS case – Mother had done nothing to address her substance abuse or work toward reunification with the Children. She continued to use methamphetamine, sought no treatment, and went long periods without visiting the Children. This pattern continued even after being found in contempt for failing to comply with the dispositional order. After the termination petitions were filed in February 2018, Mother attended an initial evaluation for mental health and drug treatment at Stepping Stones but then she

did not follow through with treatment and was discharged by the provider. It is telling that the written evaluation from Stepping Stones indicates that Mother reported to the evaluator that she did not have a problem with drugs and that she had never used methamphetamine. The trial court aptly observed:

> Mother's pattern of prioritizing illegal substances over the best interest of her children encompasses the duration of the [Children's] active CHINS cause and spans a period of nearly twenty (20) years, starting with her first DCS substantiation in the year 2000. Her actions illustrate a pattern of conduct that is unlikely to be remedied and provides the Court with the best predictor of her future behavior.

*Appellant's Appendix* at 29.

[22] In the month or two leading up to the final termination hearing, Mother made some steps forward. She obtained employment at McDonalds and moved into a one-bedroom apartment, and four days before the hearing, she attended an intake appointment at Counseling for Change and scheduled a therapy session. The trial court, however, acted within its discretion by rejecting these eleventh-hour efforts and focusing on Mother's substantial history of drug use, DCS involvement, neglect, and lack of engagement in services. Commensurate with her history of poor choices and drug abuse, Mother tested positive for methamphetamine less than a month before the hearing (as well as fifty-eight other times), lived with a man previously convicted of drug dealing and domestic violence, and had only seen the Children once in nearly six months. The trial court's determination that there is a reasonable probability that the

conditions that resulted in the removal of the Children will not be remedied is supported by clear and convincing evidence.

[23] Mother also asserts, without any analysis, that the evidence was insufficient to support the trial court's finding that termination was in the Children's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the children and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[24] Here, both the CASA and FCM Austin opined that termination of Mother's parental rights was in the best interests of the Children. The CASA noted Mother's lack of compliance with the case plan and her history of CHINS cases, spanning nearly twenty years and including several of her children. The CASA then described how the Children, particularly C.L., have flourished in

foster care, with caregivers who love them, care for them, and provide boundaries. FCM Austin testified that termination was in the Children's best interests so that they can "move forward to find permanency in a home where they can thrive and live up to their full potential." *Transcript* at 76. The evidence was sufficient to show by clear and convincing evidence that termination was in the Children's best interests.

[25] Finally, Mother challenges whether there is sufficient evidence that DCS has a satisfactory plan for the care and treatment of the Children following termination. She notes that the Children are not in a pre-adoptive home and asserts that given her "compliance with treatment, 2 months of sobriety, and housing and employment situation, the children would not be harmed by allowing [her] additional time to prove her ability to be reunified". *Appellant's Brief* at 13.

[26] Mother has had ample opportunity to show her commitment to reunification but has rather turned to drugs time and again. The Children deserve permanency in their lives, which Mother has been unable or unwilling to provide them. Although they are not in a pre-adoptive home, their current foster parents are willing to continue to work with them when it comes time to transition to a new home. The plan is for the Children to be adopted together through the SNAP program, and FCM Austin does not expect any obstacles in this regard. This is a satisfactory plan for the care and treatment of the Children. *See In re D.D.*, 804 N.E.2d at 268 ("[the] plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going

after the parent-child relationship is terminated"); *see also In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) ("a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children"), *trans. denied*.

[27] Judgment affirmed.

Najam, J. and Pyle, J., concur.